UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| MORRYDE INTERNATIONAL INC,<br><br>Plaintiff,<br><br>v.<br><br>AIRXCEL INC,<br><br>Defendant. | Case No. 3:25-CV-271-CCB-JEM |

**OPINION AND ORDER**

Before the Court is Plaintiff MORryde's Motion for Preliminary Injunction. (ECF 36). In this motion, MORryde asks the Court to preliminarily enjoin Defendant Airxcel from making, using, offering for sale, or selling the allegedly infringing staircase products until this matter is resolved on the merits. Airxcel opposes MORryde's request. (ECF 51). MORryde's motion is denied for the following reasons.

## I. RELEVANT BACKGROUND

MORryde filed this motion for a preliminary injunction on December 8, 2025. (ECF 36). The Court then ordered an evidentiary hearing and permitted narrow discovery before that hearing. (ECF 79; ECF 84). On August 24, 2026, the evidentiary hearing was held. (ECF 114).

This case involves allegations of infringement of patents relating to RV stair products. MORryde seeks a preliminary injunction barring Airxcel's alleged infringement of two of these patents: U.S. Patent No. 11,739,534 ("the '534 Patent") and U.S. Patent No. 12,428,850 ("the '850 Patent") (collectively "the Subject Patents").

Airxcel argues that a preliminary injunction is inappropriate on the grounds that (1) Airxcel did not infringe the Subject Patents, (2) the Subject Patents are invalid, and (3) the Subject Patents are unenforceable.

The Subject Patents are based on RV stair features developed by MORryde employees Gary Tompkins and Anthony Granzotto. At some point before February 2016, Mr. Tompkins and Mr. Granzotto began working together on an idea to improve RV stairs. (ECF 62 ¶ 10; ECF 63 ¶ 10). According to Mr. Tompkins and Mr. Granzotto's declarations, they presented a prototype for these stairs at a MORryde sales meeting in February 2016 ("the February sales meeting"). (ECF 62 ¶ 11; ECF 63 ¶ 11).

Another MORryde employee, Dan Geans, also attended this meeting. (ECF 121 at 204:13–20). As a sales representative at MORryde, Mr. Geans had previously coordinated MORryde's fabrication of RV stairs for a different RV company called Forks RV. (*Id.* at 201:24–202:12). Forks RV initially reached out in 2014, and MORryde began producing the steps ("the Forks Product") in 2015 based on plans it received from Forks RV. (*Id.* at 202:7–14). The end customer for these steps was a company called Quixote. (*Id.* at 203:14–15). After seeing the prototype stairs during the February sales meeting, Mr. Geans noted that the Forks Product was similar to the prototype. (ECF 103-6 at 2 ("Just realized after a visit out that they are already using a step that Gary T created upstairs. In fact we are building it for them. I've brought Gary and Joe up to speed and shared our prints as well as the end users website.")). Mr. Geans then emailed photographs and engineering prints of the Forks Product to Mr. Tompkins, Mr. Granzotto, and others at MORryde. (ECF 103-14; ECF 103-18).

MORryde then filed a provisional patent application in June 2016. (ECF 48-48). The ’534 Patent was issued in August 2023, and the ’850 Patent was issued in September 2025. (ECF 21-3; ECF 21-4). Airxcel began selling a competing product that MORryde alleges infringes the Subject Patents in December 2023. (ECF 109-1 ¶ 25). After attempting to resolve the issue with Airxcel, MORryde filed this lawsuit on March 27, 2025. (ECF 1).

## II. LEGAL STANDARD

The purpose of a preliminary injunction is to “preserve the relative positions of the parties until a trial on the merits can be held.” *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). Though a preliminary injunction yields only “temporary success” without “conclusive[] resol[ution]” of the matter, it endures until the case is decided on the merits. *Id.* at 201. It is a “drastic and extraordinary remedy,” the effects of which may be both far-reaching and long-lasting. *Nat’l Steel Car, Ltd. v. Canadian Pac. Ry.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004).

This extraordinary remedy is never granted as a matter of right. *Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Instead, the issuance of a preliminary injunction rests within the sound discretion of the trial court. *Ashcroft v. American Civ. Liberties Union*, 542 U.S. 656, 664 (2004); *see also Buffington v. Harvey*, 95 U.S. 99 (1877). And the burden of showing that a preliminary injunction is warranted rests squarely on the shoulders of the movant. *Mazurek*, 520 U.S. at 972 (explaining that a preliminary injunction “should not be granted unless the movant, *by a clear showing*, carries the

burden of persuasion"); *see also Winter*, 555 U.S. at 22 (characterizing preliminary injunctive relief as "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief").

To obtain a preliminary injunction, a party must show four things: (1) likelihood of success on the merits, (2) likelihood it will suffer irreparable harm unless the preliminary injunction is granted, (3) that the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Natera, Inc. v. NeoGenomics Labs.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024). No single factor entitles a party to preliminary relief. The Court must "weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Proctor & Gamble Co. v. Kraft Foods Glob., Inc.*, 549 F.3d 842, 847 (Fed. Cir. 2008). But a failure to show a likelihood of success on the merits or irreparable harm may preclude preliminary relief. *See Texas Instruments Inc. v. Tessera, Inc.*, 231 F.3d 1325, 1329 (Fed. Cir. 2000) (explaining that a failure to establish likelihood of success on the merits or irreparable harm may doom a preliminary injunction regardless of the strength of other factors); *see also Apple, Inc. v. Samsung Electronics Co., Ltd.*, 678 F.3d 1314, 1319–20 (Fed. Cir. 2013) (affirming denial of preliminary injunction based on failure to show one factor without reaching the other three factors).

When preliminary relief is granted, it is "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395. Because the findings drawn from these less formal procedures and less complete evidence are provisional, they do not bind the parties or

the Court at trial. *Id.*; *see also* Samuel Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. 809, 817 (2025) (explaining that preliminary findings supporting grant or denial of a preliminary injunction are "not final with respect to fact or law"). With respect to likelihood of success on the merits in particular, the Supreme Court has warned against "improperly equat[ing] 'likelihood of success' with 'success' and treating preliminary injunctions as tantamount to decisions on the underlying merits." *Stinnie*, 604 U.S. at 200–01 (internal quotation marks and citation omitted) (alteration in original).

## III. FINDINGS AND CONCLUSIONS

MORryde seeks a preliminary injunction barring Airxcel from producing stairs that allegedly infringe the '850 patent and the '534 patent ("the Subject Patents"). Airxcel argues that a preliminary injunction is inappropriate because MORryde cannot show likelihood of success on the merits, likelihood of irreparable injury, that the balance of the equities tilts in MORryde's favor, or that a preliminary injunction is in the public interest.

### a. MORryde's Likelihood of Success on the Merits

For MORryde to show likelihood of success on the merits in a patent case, it must demonstrate "(1) it will likely prove infringement and (2) its infringement claim will likely withstand challenges to the validity and enforceability of the patents." *Natera*, 106 F.4th at 1375 (quoting *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001)). Because Airxcel bears the burden of proving invalidity or non-enforceability at trial, it "can defeat the preliminary injunction by establishing a

substantial question as to invalidity or unenforceability." *A.G. Design & Assocs. LLC v. Trainman Lantern Co.*, 271 F. App'x 995, 997 (Fed. Cir. 2008). If Airxcel raises a substantial question of enforceability or validity, MORryde must then show that "it will likely withstand the challenge[]." *Natera, Inc.*, 106 F.4th at 1376–77. If MORryde cannot show that it is more likely than not to overcome the issue raised by Airxcel, the preliminary injunction should not issue. *Id.* at 1377. To prevail, then, MORryde must successfully refute each of Airxcel's invalidity and non-enforceability arguments. *See Ridge Corp. v. Kirk NationaLease Co.*, 181 F.4th 1224, 1230 (Fed. Cir. 2026).

*i. Enforceability Challenge*

The Court first addresses Airxcel's challenge to the enforceability of MORryde's patents on grounds of inequitable conduct. Like the preliminary injunction MORryde seeks, the defense of inequitable conduct is equitable in nature. *See Consolidated Aluminum Corp. v. Foseco Intern. Ltd.*, 910 F.2d 804, 812 (Fed. Cir. 1990) ("Indeed, what we have termed 'inequitable conduct' is no more than the unclean hands doctrine applied to particular conduct before the PTO."). And like a preliminary injunction, the defense of inequitable conduct produces a "drastic" effect. *See Nat'l Steel Car*, 357 F.3d at 1324. While invalidity arguments bear only on the limitations to which they apply, inequitable conduct by the patentee bars enforcement of an entire patent. *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011); *see also Aventis Pharma S.A. v. Amphastar Pharm., Inc.*, 525 F.3d 1344, 1349 (Fed. Cir. 2008) (Rader, J., dissenting) (referring to the remedy for inequitable conduct as the "atomic bomb" of patent law).

To successfully raise this defense, Airxcel must show by clear and convincing evidence that MORryde engaged in "affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive. *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1318 (Fed. Cir. 2000); *see also Therasense*, 649 F.3d at 1290. Intent and materiality are separate requirements. *Id.* They may not be considered on a "sliding scale," where a stronger showing of one offsets a weaker showing of the other. *Id.* Nor may intent be inferred from materiality. *Id.* But "[b]ecause direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Id.* In such a case, however, "the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* (quoting *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)). Because the burden of proving this defense rests on Airxcel, MORryde "need not offer any good faith explanation" unless Airxcel first "prove[s] a threshold level of intent to deceive by clear and convincing evidence." *Star Scientific*, 537 F.3d at 1368.

Omitted references to prior art are material if the USPTO "would not have allowed a claim had it been aware of the undisclosed prior art." *Therasense*, 649 F.3d at 1291. So, to assess "the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed evidence." *Id.* If the defendant can show by a preponderance of the evidence the USPTO would not have allowed the claim, materiality is established. *Id.*

There is one relevant exception to this materiality standard. The Federal Circuit has explained that "[w]hen the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material." *Id.* (citing *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983) ("[T]here is no room to argue that submission of false affidavits is not material . . . .")). But this exception does not apply in cases of "mere nondisclosure of prior art references to the PTO" or "failure to mention prior art references in an affidavit." *Id.*

Airxcel raises two related but distinct allegations of inequitable conduct. First, Airxcel argues that there is a substantial question over whether MORryde misrepresented the inventorship of the Subject Patents to the USPTO. Second, Airxcel argues that there is a substantial question over whether MORryde failed to disclose references it believed to be material to the USPTO.

1. Inventorship

For purposes of inequitable conduct, inventorship is always material. *PerSeptive Biosystems*, 225 F.3d at 1321. Thus, the question for the Court on this issue is whether Airxcel can show misrepresentation related to inventorship with the specific intent to deceive. Airxcel's theory of inequitable conduct in the context of inventorship rests largely on what Mr. Tompkins and Mr. Granzotto knew, and when they knew it. It argues that when Mr. Tompkins and Mr. Granzotto swore that they were "the original inventor or an original joint inventor" of the Subject Patents in the June 2016 provisional patent application, they knew that they were making a false statement. (ECF 48-23 at 2).

In support, it points to the February 2016 MORryde sales meeting. Mr. Granzotto and Mr. Tompkins assert in their declarations that they presented a prototype of their invention at this meeting. (ECF 62 ¶ 11; ECF 63 ¶ 11). They assert that they learned for the first time at the sales meeting that MORryde was already producing the Forks Product for Forks and Quixote. (*Id.*) In their sworn declarations, they state that they did not recall ever reviewing any depictions of that product. (ECF 62 ¶ 12; ECF 63 ¶ 12). And they clearly assert that they only learned about the Forks Product after "conceiving the invention in the Asserted Patents and building the first prototype of it." (ECF 62¶ 11; ECF 63 ¶ 11).

Airxcel contends that the prototype displayed at the February sales meeting lacked many of the key features of the invention ultimately presented to the USPTO. For example, Mr. Tompkins testified that the prototype presented at the meeting did not show a stop bracket, a feature claimed in both Subject Patents. (ECF 121 at 152:22–153:5; *see also* ECF 158-10). There also appear to be significant differences between the threshold plate in the prototype and the threshold plate described in the subject patents. For instance, the Subject Patents claim a "ramped portion" and a "spanning portion," but the prototype uses a flat threshold plate with neither a ramped portion nor a spanning portion. (*Compare* ECF 37-1 *and* ECF 37-2 *with* ECF 108-10).

These differences are significant because they show that the prototype underwent substantial evolution between the February 2016 sales meeting and the provisional patent application MORryde submitted in June 2016. Airxcel argues that this evolution only occurred because Mr. Tompkins and Mr. Granzotto received details

of the Forks Product. Mr. Tompkins testified that at the time he built the prototype, his focus was on the threshold plate because if he could not get the threshold plate to work, "there really wasn't any reason to move forward with anything else." (ECF 121 at 153:9–13). After the sales meeting, Mr. Geans sent Mr. Tompkins and Mr. Granzotto prints and photographs of the Forks Product, including a close-up photograph of the threshold plate of the Forks Product. (ECF 103-6; ECF 103-18). These photographs and prints show that the threshold plate eventually claimed in the Subject Patents is much closer in design to the threshold plate in the Forks Product photographs than it is to the threshold plate in the prototype photograph. (*Compare* ECF 103-18 *with* ECF 108-10).

Airxcel also argues that Mr. Tompkins and Mr. Granzotto's testimony and declarations are not credible due to a number of inconsistencies and contradictions. The Court agrees. Over the course of the evidentiary hearing, it became apparent that Mr. Granzotto did not have a clear memory of the events he discussed in his declaration. For example, Mr. Granzotto states in his declaration that, along with Mr. Tompkins, he "built a prototype incorporating the claimed inventions of the Asserted Patents." (ECF 63 ¶ 10). But at the hearing, he testified that though he "was involved in the prototyping process," he actually did not remember whether he "was physically involved in putting the pieces together." (ECF 121 at 197:6–19). Mr. Granzotto also states in his declaration that he did "not recall ever reviewing the engineering drawings provided by Forks RV or any other depictions related to the Forks RV Product," (ECF 63 ¶ 12), but then confirmed at the evidentiary hearing that he saw depictions of the Forks Product in an email he received from Dan Geans, (ECF 121 at 198:1–23).

Mr. Tompkins' declaration and testimony on the topic of inventorship is even less credible. The Court notes that he has now told three different stories about who actually built the prototype. In his declaration, he states that he and Mr. Granzotto built the prototype together. (ECF 62 at ¶ 10). At his deposition, he stated that he built the prototype alone. (ECF 104-4 at 52:24–53:4). And at the hearing, he testified that he "only built the hinge plate" on the prototype and that Mr. Granzotto "probably did" help him build the prototype. (ECF 121 at 169:10–14, 170:4–8). This is especially significant given the changes made to the prototype threshold plate after Mr. Tompkins and Mr. Granzotto received photographs of the Forks Product threshold plate in February 2016.

But this is not his only credibility issue. Mr. Tompkins has also testified inconsistently about whether he actually attended the February sales meeting. In his declaration, he asserts that he was "informed for the first time" at the February sales meeting that "MORryde had previously manufactured" the Forks Product. (ECF 62 ¶ 11). But at his deposition, he stated that "as far as I can remember," he did not attend the February sales meeting. (ECF 104-4 at 78:23–79:10). Then at the hearing, he equivocated on this question but ultimately appeared to confirm his deposition testimony and admit that his declaration statement was false. (ECF 121 at 158:16–21).[1]

[1] The Court notes with concern that despite affirming the truth of his declaration under penalty of perjury, Mr. Tompkins' hearing testimony suggests that he did not review his declaration before signing it. At one point, Mr. Tompkins even testified that he did not know the definition of the word "depictions" despite asserting in his declaration that he had never seen depictions related to the Forks RV Product. (ECF 62 ¶ 12; ECF 121 at 173:15–10 ("Q: Mr. Tompkins, you signed your name to this declaration, right? A: Yes. Q: And you're saying now that you don't know what 'depictions' is? A: I don't know the definition of that. Q: But you signed your name to this declaration; didn't you? A: Yes.")).

Lastly, and most critically, Mr. Tompkins admitted at the hearing that he did not actually know what claims were included in the Subject Patents. In his declaration, he states that "[b]y February 2016, we had built a prototype incorporating the claimed inventions of the Asserted Patents." (ECF 62 ¶ 10). But, as discussed above, it appears that at least two elements claimed in the Subject Patents, the stop bracket and the threshold plate with a ramped portion and spanning portion, were not included in the prototype.

Mr. Tompkins' confusion over this seems to stem from the fact that, contrary to what he stated under penalty of perjury in his declaration, he does not know what was actually claimed in the Subject Patents. At his deposition, he testified that he did not "know what the exact claims are for the patent." (ECF 104-4 at 74:23). At the evidentiary hearing he attempted to clarify that because he was "not a patent attorney," he does not "know the specifics that are in the patent." (ECF 121 at 161:16–19). But this does not explain how he could have truthfully told the USPTO that he was an original inventor of the Subject Patents if he did not actually understand what was claimed in those patents.

Mr. Tompkins and Mr. Granzotto both testified at the evidentiary hearing that they did not intentionally deceive the USPTO. (ECF 121 at 156:18–21; 194:17–21). But the credibility of this testimony collapses under the weight of the numerous inconsistencies and contradictions described above. Mr. Granzotto cannot remember the degree to which he actually participated in the development of the prototype before the February sales meeting and is unsure of when and how he learned of the Forks Product. Mr.

Tompkins cannot consistently describe who built what parts of the prototype, cannot remember whether he attended the February sales meeting where the prototype was presented and the Forks Product was discussed, and does not know what was actually claimed in the Subject Patents he told the USPTO he invented. At this preliminary stage, this creates a substantial question of inequitable conduct.

Still, MORryde urges the Court to conclude that Airxcel's theory cannot succeed because it is "based on the mistaken belief that prior art can be used to challenge inventorship; it cannot." (ECF 124 at 20). In support, it cites *International Medical Devices, Inc. v. Cornell*, 174 F.4th 64, 79 (Fed. Cir. 2026). In that case, the Federal Circuit explained that "[a] person who contributes only what is already known in the prior art does not contribute to conception and is not an inventor." *Id.* But in *International Medical Devices*, the issue of inventorship arose in the context of an invalidity contention, not inequitable conduct. This matters because the context dictates the focus of the inquiry. When considering inventorship in the context of invalidity, the question is whether the challenged patent names "the correct inventor or inventors." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349–50 (Fed. Cir. 1998). When considering inventorship in the context of inequitable conduct, the question is, among other things, whether the named inventor submitted a false oath of inventorship to the USPTO. *See PerSeptive Biosystems*, 225 F.3d at 1322 (explaining that "the issue is not inventorship per se, but misinformation about inventorship"); *see also Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 828 (Fed. Cir. 2010).

At this preliminary stage, Airxcel has not proved misrepresentation related to inventorship or specific intent to deceive by clear and convincing evidence. But it does not need to. The certain fact that at least one inventor did not actually understand the claims of the patents he told the USPTO he invented, combined with the cloud of inconsistency and contradiction created by Mr. Granzotto and Mr. Tompkins' shifting stories, is enough for the Court to find that a substantial question exists over whether MORryde intended to deceive the USPTO in its patent application. As Airxcel points out, it is hard to understand how Mr. Tompkins could truthfully tell the USPTO that he was "the original inventor or an original joint inventor" of the Subject Patents when he did not actually know what he was claiming to have invented. (ECF 48-23 at 2). Neither MORryde's argument that the disclosure of the Forks Product cannot bear on inventorship nor Mr. Tompkins and Mr. Granzotto's testimony that they did not intend to deceive the USPTO are sufficient to overcome this substantial question of truthfulness on the topic of inventorship. On this limited record, it seems more likely than not that Airxcel will be able to show inequitable conduct by clear and convincing evidence at trial.

2. Failure to Disclose References

Next, Airxcel argues that there is a substantial question over whether MORryde failed to disclose references it believed to be material to the USPTO. Its argument can be distilled down to this: MORryde had a significant amount of material regarding the Forks Product in its possession by the time it submitted its provisional patent application, but it failed to include much of this material with its application. Airxcel

admits that MORryde disclosed prints of the Forks Product. This, it argues, establishes materiality. Airxcel then argues that MORryde's failure to disclose "*better* evidence" about the Forks Product "strongly suggests an intent to deceive." (ECF 136 at 24).

It is certainly hard to understand why MORryde submitted a grainy photograph of stairs on a Quixote trailer with its patent application, (ECF 48-24 at 18), but omitted an engineering print of the Forks Product, (ECF 103-14), and two clear photographs of the Forks Product, one of which provided a close-up view of the Forks Product's threshold plate, (ECF 103-18). But "because neither mere nondisclosure of prior art references to the PTO nor failure to mention prior art references in an affidavit constitute egregious misconduct, claims of inequitable conduct that are based on such omissions require proof of but-for materiality." *Therasense*, 649 F.3d at 1292–93. Airxcel offers no persuasive argument that had these references been disclosed, the USPTO would have made a different decision. Instead, it relies on MORryde's decision to submit one reference as evidence that MORryde believed the references it withheld were in fact material. But this does not show that the addition of the missing references to the application would have changed the USPTO's decision. Without such a but-for showing, the Court finds that Airxcel has not identified a substantial question of inequitable conduct on this issue.

In the past, the Federal Circuit has warned that "the habit of charging inequitable conduct in almost every major patent case has become an absolute plague." *Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988). "With inequitable conduct casting the shadow of a hangman's noose," the Federal Circuit has found it

"unsurprising that patent prosecutors regularly bury PTO examiners with a deluge of prior art references, most of which have marginal value." *Therasense*, 649 F.3d at 1289. Accordingly, when defendants allege inequitable conduct on "the slenderest grounds," it is viewed as a "negative contribution to the rightful administration of justice." *Burlington*, 849 F.2d at 1422.

But in this case, Airxcel does not stake its charge of inequitable conduct on slender grounds. The assertions Mr. Granzotto and Mr. Tompkins made in their declarations have been progressively eroded by the process of discovery and live cross-examination to the point where it is difficult to credit any element of their narrative about the invention of the Subject Patents. This, combined with the other issues discussed above, convince the Court that it is more likely than not that Airxcel will be able to establish inequitable conduct in the context of inventorship at trial. Without showing that it is likely to overcome Airxcel's inequitable conduct defense on this subject, MORryde cannot show that it is likely to succeed on the merits of its action.

*ii. Non-Infringement and Invalidity*

A successful defense of inequitable conduct bars enforcement of an entire patent. *Therasense*, 649 F.3d at 1285. Thus, even if MORryde can defeat each non-infringement and invalidity argument brought by Airxcel, a substantial question still exists over whether MORryde engaged in inequitable conduct that would bar the enforcement of the Subject Patents against Airxcel. Even if the Court assumes the construction of the Subject Patents most favorable to MORryde, assumes that Airxcel cannot show that the Subject Patents are invalid, and assumes that Airxcel infringed the Subject Patents,

MORryde cannot show a likelihood of success on the merits without overcoming Airxcel's inequitable conduct defense. Accordingly, preliminary claim construction and a strength assessment of Airxcel's invalidity and non-infringement arguments on the limited record before the Court are unnecessary to decide this motion.

**b. The Irreparability of MORryde's Alleged Injury, the Balance of Equities and the Public Interest**

Because MORryde has not established a likelihood of success on the merits, the Court need not reach the remaining preliminary injunction factors. "The problem for the judge asked to grant a preliminary injunction is that [s]he is being asked to rule in a hurry, on the basis of incomplete information. The risk of error is high." Richard A. Posner, *Economic Analysis of Law* § 21.4, at 522 (3d ed. 1986). Because of this high risk of error, the Court will only reach those issues necessary to rule on this motion. Even assuming MORryde showed a likelihood of irreparable injury, that the balance of the equities are in its favor, and that a preliminary injunction is in the public interest, its failure to show that it is likely to succeed on the merits is fatal to its motion. *See Texas Instruments*, 231 F.3d at 1329 (explaining that a "district court may deny a preliminary injunction based on the movants failure to establish [likelihood of success on the merits or irreparable injury] without making additional findings respecting the other factors"); *see also Apple*, 678 F.3d at 1319–20 (affirming denial of preliminary injunction based on failure to show one factor without reaching the other three factors).

## IV. CONCLUSION

For these reasons, the Court **DENIES** MORryde's Motion for a Preliminary Injunction. (ECF 36). The Court's previous stay of case deadlines pending resolution of this motion is **LIFTED.** (ECF 84).

SO ORDERED on September 11, 2026.

/s/ *Cristal C. Brisco*
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT